IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

```
DEBRA MCCONNELL,              )
                             )
     Plaintiff,               )
                             )
     v.                       )   CIVIL ACTION NO.
                             )    2:04cv694-T
WESTPOINT STEVENS,            )      (WO)
INC.,                         )
                             )
     Defendant.               )
```

OPINION

Relying on Title VII of the Civil Rights Act of 1964, 42
U.S.C.A. §§ 1981a, 2000e through 2000e-17, plaintiff Debra
McConnell brings this lawsuit claiming that her former
employer, defendant Westpoint Stevens, Inc., terminated her
employment in retaliation for complaining about the sexual
harassment of another employee.  Relying on Alabama law,
McConnell also claims that Westpoint Stevens negligently and
wantonly failed to supervise and train adequately, and
negligently or wantonly retained, her direct supervisor.
The court's jurisdiction is proper under 42 U.S.C.A.
§ 2000e-5(f) (Title VII) and 28 U.S.C.A. §§  1331 (federal

question), 1343 (civil rights), and 1367 (supplemental).
This case is now before the court on Westpoint Stevens's
motion for summary judgment, which, for the reasons
discussed below, will be granted.


## I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and admissions on
file, together with the affidavits, if any, show that there
is no genuine issue as to any material fact and that the
moving party is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c).  Under Rule 56, the party seeking
summary judgment must first inform the court of the basis
for the motion, and the burden then shifts to the non-moving
party to demonstrate why summary judgment would not be
proper.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.
Ct. 2548, 2553 (1986); see also Fitzpatrick v. City of
Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (discussing
burden-shifting under Rule 56).  The non-moving party must

affirmatively set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials in the pleadings.  Fed. R. Civ. P. 56(e).

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986).  In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).

## II. FACTUAL BACKGROUND

The facts, as presented in the light most favorable to McConnell, are as follows.

Westpoint Stevens is a manufacturer and marketer of bed and bath home fashions.  McConnell is a registered nurse in the States of Alabama and Georgia and worked as an

3

occupational health nurse at Westpoint Stevens's Fairfax
Fabrication, Finishing, and Distribution Centers in Valley,
Alabama, from 1990 until she was terminated on October 29,
2003.[1]  Her duties included conducting hearing, audio,
pulmonary, and vision testing; doing physical examinations
of employees; following worker's compensation cases; and
assisting human resources.[2]  In addition, she supervised two
nurses and an occupational health technician.[3]

At the time she was terminated, McConnell was under the
direct supervision of Human Resources Manager Kim Williams
and Plant Manager Chad Butts.[4]  Williams was supervised by
Butts as well as by Woodrow "Woody" Sluss, Westpoint
Stevens's Divisional Director of Human Resources for Bed and
Bath Products South division.[5]  Butts was supervised by Tommy

---

1.   Plaintiff's response to motion for summary judgment
(Doc. No. 16), pp. 1-2.

2.   **Id**.

3.   **Id**.

4.   **Id**.

5.   **Id**.

4

Bledsoe, General Manager for Westpoint Stevens's Bath Products South division.[6]

In July 2003, McConnell learned that Djuna Black, one of the two nurses under her supervision, planned to resign. She met with Williams and Butts about the impending resignation, and Butts told her to "start looking around, interviewing."[7] McConnell also mentioned Black's impending resignation to Bledsoe in passing. McConnell recounts the conversation in the following way:

> "I was standing outside the clinic in a little lobby that you had before you walked into the clinic. [Bledsoe] had to cut through there ... and he was walking by. And he said how are you doing. I said okay. ... And I said did you know we were losing a nurse. And he stopped and turned around and said no, who? And I said [Black]. I said she has put in a notice and we're looking for a nurse because we have a lot of testing to do. ... And he said well, we could move somebody down here to help from one of the other clinics. And I said, oh, okay. He

_____

6.   Id.

7.   Defendant's motion for summary judgment (Doc. No. 10), Ex. 1, p. 95.

said we will keep the testing up.  Don't
worry about it."[8]

McConnell interpreted Bledsoe's comments to simply mean that

he would send over some temporary assistance from another

facility if it became necessary to help the clinic keep up

with its occupational testing duties; she did not understand

him to mean that she should refrain from hiring a

replacement for Black.[9]

The ensuing facts surrounding McConnell's search for a

suitable nursing applicant are somewhat lengthy and

complicated.  Suffice it to say, however, that ,based on her

interactions with Butts, Williams, and Bledsoe, McConnell

believed that she had been given the authority to hire a

nurse to replace Black.  She conducted a search for a

replacement nurse for several months and ultimately offered

_____

8.   Id. at 121.

9.   Id. at 121.  Bledsoe's recollection of the
conversation is markedly different.  He recalls telling
McConnell: "I would likely fill the pending vacancy by
internally transferring another WestPoint Stevens employee
into the nurse position. ... I made it clear to Ms.
McConnell that she was not to proceed with hiring someone to
fill the nurse position."  Id., Ex. 2, p. 2.

6

the job to a suitable applicant, Theresa Chestnut.  Chestnut

accepted the offer.  Shortly thereafter, it became apparent

to McConnell that she had misunderstood Bledsoe during their

brief conversation about Black's resignation and had hired

Chestnut without Bledsoe's blessing.[10]  Although she

apologized to Bledsoe and was able successfully to rectify

the situation (Chestnut ultimately withdrew her

application), McConnell was subsequently terminated on

October 29, 2003, for committing "gross insubordination" by

disobeying Bledsoe's orders.[11]  The parties do not dispute

that, although McConnell was informed of her termination by

Butts and Williams, the decision to terminate her was made

by Bledsoe and Sluss, who was asked by Bledsoe to conduct an

investigation into the matter.[12]

McConnell claims that she was terminated not for

offering a job to Chestnut, but rather in retaliation for

_____

10.  Id., Ex. 1, p. 148.

11.  Id. at 158.

12.  Plaintiff's response to motion for summary judgment
(Doc. No. 16), Ex. 18, p. 97.

7

previously complaining to Butts and Williams about the sexual harassment of another employee.

Approximately six to eight weeks before she was fired, McConnell came to believe that another female employee, Angela Michelle Davidson, was being sexually harassed by her female supervisor, Terry Edmonson.[13]  Although McConnell believed the harassment was primarily coming from Edmonson, she also believed that Leroy Abney, a male supervisor, was contributing to the harassment at the direction of Edmonson. McConnell first learned of Davidson's problems with Edmonson when she received a phone call from Black (the nurse whose resignation later prompted the extension of a job offer to Chestnut), informing her that Davidson had come to the clinic at the plant in an agitated state and was upset and

_____

13.  Plaintiff's response to motion for summary judgment (Doc. No. 16), p. 3.  McConnell also stated in her deposition that at some point _after_ she was fired, Davidson complained to her about Abney "touching" her.  However, McConnell never complained to management about Davidson's specific allegations regarding Abney, because she did not know about them until after she was terminated. Defendant's motion for summary judgment (Doc. No. 10), Ex. 1, p. 218-19.

crying.[14]   Black told McConnell that Davidson's blood
pressure was high and that she had sent Davidson to see a
doctor.   Concerned, McConnell joined Davidson at the
doctor's office and observed Davidson telling the doctor
that she "had a lot of stress at work," and "had a new
department head who didn't like her and there were a lot of
problems going on."[15]  McConnell watched the doctor prescribe
some medication for Davidson and listened as he instructed
her to take some time off of work.[16]   After leaving the
doctor's office, Davidson told McConnell, "I can't go on
much longer like this. ... I feel like I'm being harassed.
I feel like I'm being lied on. ... I feel like [Edmonson and
Abney] are trying to get my job."[17]  McConnell told Davidson
that she would discuss the harassment with Williams and

---

14. <u>Id</u>. at 193.

15. <u>Id</u>. at 193-94.  McConnell states that, during this
conversation with the doctor, Davidson "didn't go into a lot
of details.  She just told him she had a new department head
who didn't like her, and was harassing her."  <u>Id</u>. at 195.

16. <u>Id</u>. at 193.

17. <u>Id</u>. at 194.

inform him of the doctor's orders that Davidson take time off of work to recover from her apparent emotional distress.

Shortly thereafter, McConnell went to Williams and told him that Edmonson did not like Davidson.  She suggested to Williams that Edmonson's negative feelings toward Davidson stemmed from the fact that Edmonson had once had an intimate relationship with a former male employee named Dennis Brooks.  Edmonson, McConnell surmised, was jealous of women such as Davidson, with whom Brooks was friendly during his tenure at Westpoint Stevens.[18]  McConnell asked Williams, "[W]hat are you going to do about that?"[19]  Williams

_____

18. McConnell made it clear both in her deposition testimony as well as to Williams that the reason she suspected Edmonson was "harassing" Davidson was "because of this Dennis Brooks."  _Id_. at 206.  McConnell stated that "[Edmonson] didn't like [Davidson] because of Dennis" and that "[Edmonson] felt like Dennis kind of liked [Davidson]."  McConnell stated she thought that Edmonson felt threatened by Davidson.  _Id_. at 207-08.  McConnell does not indicate whether she came to the conclusion that Brooks was the reason Edmonson was harassing Davidson based on her own personal observations or on what Davidson told her.

19. _Id_. at 195.

responded by smiling and saying that Davidson and Edmonson "just need to forget about that and get on with their job."[20]

McConnell again spoke with Davidson about the alleged harassment when Davidson came to the clinic for her "return to work" physical after her time off.  At that time, Davidson stated that she was "very nervous about going back out there."[21]  She told McConnell that Edmonson and Abney often reprimanded her for dressing suggestively, and said she felt like Edmonson "was after her" and "would eventually get enough on her to fire her."[22]  McConnell told Davidson to do the best job she could do, and that, if the alleged harassment continued, to raise her complaints to Williams.[23]

In addition to what Davidson told her, McConnell personally observed Edmonson's interactions with Davidson on several occasions.   On one occasion, McConnell called

---

20. **Id**.

21. **Id**. at 209.

22. **Id**.

23. **Id**. at 210.

11

**Davidson into the clinic to ask her a question about a previously sustained injury.  While Davidson was talking with McConnell, Edmonson appeared in the doorway looking angry, and asked Davidson what she was doing in the clinic. McConnell told Edmonson that it would only take a minute, and partially closed the door.  Davidson then remarked to McConnell, "I've got to get back to my job.  She stays on me."[24]  In addition, whenever McConnell made rounds on the floor of the factory in the morning and approached Davidson to greet her, Edmonson would stare at Davidson and start to walk over to her, as if to reprimand her.[25]  McConnell observed that Edmonson's staring made Davidson "uncomfortable."[26]**

**McConnell did not think much of these incidents at the time, but later realized ,in hindsight, that, "[I]f that is sexual harassment, if a female can harass another female and**

_____

**24.  Id. at 201-04.**

**25.  Id. at 213.**

**26.  Id. at 213-14.**

12

it be classified sexual harassment, then [Edmonson] is sexually harassing her."[27]  McConnell admits that, although she was personally convinced that Edmonson was harassing Davidson because she was "jealous" of her, her understanding of whether Edmonson's behavior satisfied the legal definition of sexual harassment was, and remains, unclear to her.[28]

---

27.  Id. at 205.

28.  The following exchange occurred at McConnell's deposition:

> "Q: Even to this day you haven't formed a solid opinion in your mind as to whether that harassment was sexual harassment or just harassment, because she, [Davidson], and Terry Edmonson didn't get along?
>
> "A: I formed an opinion in my mind, but I don't know if what I think goes along with the federal—
>
> "Q: Definition?
>
> "A: Yes.  Definition of sexual harassment. ... I feel like if you've got someone who is over someone else and they can direct their operations and what kind of--whether they are employed or not, and there is a guy in between and this person is letting

(continued...)

In addition to speaking to Williams about the alleged harassment shortly after the incident with Davidson in the doctor's office, McConnell complained about Davidson's situation to Butts in late August 2003. She told him that Davidson felt like she was being harassed, and warned Butts that Davidson was considering filing a complaint with the Equal Employment Opportunity Commission (EEOC). McConnell told Butts that she thought the matter should be handled internally, and that "if [the EEOC] were to question me, I would have to tell the truth and have to tell them how I

---

28.  (...continued)
      that bother them in their direction of the person, then in my mind that is sexual harassment. But I don't know if it fits the federal definition.

      :Q: Okay. That's the only way that in your opinion Edmonson sexually harassed Davidson?

      "A: Yes. I think she was jealous of [Davidson]."

Id. at 227-28.

felt.  And I said I felt like Terry harassed her."[29]  Butts

responded to McConnell by saying that "no employee is going

to tell me how to run my floor."[30]

McConnell never specifically complained to either Sluss

or Bledsoe about Edmonson's alleged harassment of Davidson.[31]

McConnell did mention Edmonson's harassing behavior to

Bledsoe in passing, but did not specifically mention

Davidson's name.[32]  At the time they decided to terminate

McConnell, neither Sluss nor Bledsoe knew about McConnell's

---

29.  Id. at 224.

30.  Id. at 226.  Butts's account of this conversation
is different.  He claims that McConnell simply told him that
there was some "tension" between Davidson and Edmonson, but
denies that McConnell told him anything about Davidson's
plans to file an EEOC complaint, or about her plans to
support Davidson if she did file a complaint.  Id., Ex. 4,
p. 3.

31.  Id., Ex. 1, p. 222.

32.  On that occasion, McConnell says she told Bledsoe,
"[Y]ou do have one real problem out there, Terry Edmonson.
She is harassing a few of the females because of Dennis
Brooks.  Do you remember him[?]" Bledsoe responded, "yeah,
it's always something."  Id., Ex. 1, p. 222.  Bledsoe does
not recall this conversation.  Id., Ex. 2, p. 3.

complaints to Butts and Williams regarding Edmonson's
alleged harassment of Davidson.[33]

Davidson herself complained about Edmonson's behavior to
Butts, Williams, Bledsoe, and Sluss.[34]  She ultimately filed
an EEOC complaint on October 16, 2003.[35]  In her complaint,
Davidson does not mention McConnell's name and does not
indicate that another employee made complaints to management

_____

33. Defendant's motion for summary judgment (Doc. No.
10), Exs. 3 & 4.  McConnell does not present any evidence to
the contrary.  At her deposition, she stated, "I feel like
[Butts] probably related to [Bledsoe] what I said about
[Davidson] was going to file a claim with EEOC," but
admitted that she had no basis, other than her "gut
feeling," that this was the case.  Id., Ex. 1, pp. 237-38.

34. Davidson complained to Sluss and Bledsoe as early
as July 18, 2003, Plaintiff's response to motion for summary
judgment (Doc. No. 16), p. 4, and filled out an internal
complaint form on September 2, 2003.  Id., Ex. 7.  On
September 5, 2003, Davidson met with Butts, Williams,
Bledsoe, and Sluss, and, on the same day, met with Butts,
Williams, Edmonson, and Abney to discuss her complaints of
sexual harassment.  Id.  On September 23, 2003, she met with
Westpoint Stevens's Vice-President for Human Resources, Foy
Fisher.  Id.  On October 6, 2003, Davidson met with Sluss
and Fisher to discuss a disciplinary write-up she received
from Edmonson for disruptive behavior.  During that meeting,
she was told that the write-up "would stand."  Id., p. 5.

35. Id., Ex. 9.

16

on her behalf.[36]  A copy of Davidson's complaint was forwarded to Sluss by the EEOC on October 23, 2003, six days before McConnell was terminated.[37]

### III. DISCUSSION

### A. Retaliatory Discharge Claim

Title VII prohibits employers from discriminating against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C.A. § 2000e-3(a).  McConnell asserts that WestPoint Stevens terminated her in retaliation for opposing Edmonson's alleged sexual harassment of Davidson.

In order to establish a prima-facie case of retaliation under Title VII, McConnell must show that (1) she engaged in

---

36.  <u>Id</u>.

37.  <u>Id</u>., **Ex.** 10.

17

statutorily protected expression; (2) she suffered an adverse-employment action; and (3) a causal connection exists between the two events.  <u>Little v. United Techs., Carrier Transicold Div.</u>, 103 F.3d 956, 959 (11th Cir. 1997). WestPoint Stevens admits that it subjected McConnell to an adverse-employment action by terminating her.  At issue, then, are the two remaining elements: (1) whether McConnell engaged in statutorily protected expression when she complained about Edmonson's behavior toward Davidson; and, if so, (2) whether there is a causal link between her complaints and her termination.

The Eleventh Circuit Court of Appeals has held that a plaintiff engages in statutorily protected expression if "[s]he shows that [s]he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices."  <u>Little</u>, 103 F.3d at 960.  This standard has both a subjective and an objective component.  In other words,

> "A plaintiff must not only show that he <u>subjectively</u> (that is, in good faith)

18

> believed that his employer was engaged in
> unlawful employment practices, but also
> that his belief was <u>objectively</u> reasonable
> in light of the facts and record
> presented.  It thus is not enough for a
> plaintiff to allege that his belief in
> this regard was honest and bona fide; the
> allegations and record must also indicate
> that the belief, though perhaps mistaken,
> was objectively reasonable."

<u>Id</u>. (emphasis in original).  Although McConnell expressed

some doubt as to whether the conduct she complained of

qualifies as sexual harassment under the federal definition,

it is clear that she subjectively believed that Edmonson was

sexually harassing Davidson.[38]   Thus, the real issue is

---

38.  In her deposition, McConnell was clear that she
thought Edmonson was harassing Davidson because she was
jealous of the attention Dennis Brooks paid to Davidson.
She further stated,

> "I feel like if you've got someone who is
> over someone else and they can direct
> their operations and what kind of —
> whether they are employed or not, and
> there is a guy in between and this person
> is letting that bother them in their
> direction of the person, then in my mind
> that is sexual harassment.  But I don't
> know if it fits the federal definition."

Defendant's motion for summary judgment (Doc. No. 10), Ex.
(continued...)

whether her belief was objectively reasonable.

The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice "must be measured against existing substantive law." Clover v. Total System Services, Inc. 176 F.3d 1346, 1351 (11th Cir. 1999) (quoting Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1388, n. 2 (11th Cir. 1998) (failure to charge the employee who opposes an employment practice with substantive knowledge of the law "would eviscerate the objective component of our reasonableness inquiry")). Therefore, in order to determine whether McConnell's belief that Davidson was being sexually harassed was objectively reasonable, the court must consider whether the harassment complained of by McConnell satisfies the elements of a prima-facie sexual harassment claim under Title VII.

The Supreme Court has held that Title VII is not "a general civility code"; nor does it "prohibit all verbal or

_____

38.   (...continued)
1, pp. 227-28.

physical harassment in the workplace." <u>Oncale v. Sundowner</u> <u>Offshore Services, Inc.</u>, 523 U.S. 75, 80, 118 S.Ct. 998, 1002 (1998). Rather, it is "directed only at discrimination because of sex." <u>Id</u>. Thus, in order to establish a hostile environment claim premised on sexual harassment, a plaintiff must demonstrate, among other things, that the harassment was based on her sex. <u>Gupta v. Florida Board of Regents</u>, 212 F.3d 571, 582-83 (11th Cir. 2000).

The Eleventh Circuit has specifically held that "personal animosity is not the equivalent of sex discrimination. ... The plaintiff cannot turn a personal feud into a sex discrimination case." <u>McCollum v. Bolger</u>, 794 F.2d 602, 610 (11th Cir. 1986). For example, in <u>Succar v. Dade County School Board</u>, 229 F.3d 1343, 1345 (11th Cir. 2000), the Eleventh Circuit held that a plaintiff who was physically harassed and embarrassed by a co-worker after their intimate relationship dissolved failed to establish that his sex was the underlying reason for the harassment he allegedly suffered. Similarly, in <u>Pipkins v. City of Temple</u>

**Terrace, Fla.**, 267 F.3d 1197 (11th Cir. 2001), the plaintiff complained of harassment by both a male superior with whom she had had a failed extramarital relationship, as well as by her direct supervisor, a female who was friends with the male supervisor's wife and was aware of the affair.   The court held that the harassment by both supervisors was at best motivated by personal animosity and did not constitute sex-based harassment under the meaning of Title VII.   <u>Id</u>. at 1200-01.   As the appellate court explained:

> "[T]he consensual nature of the relationship between [plaintiff] and Klein and any resulting feelings of enmity determinative.   Most of the actions of which [plaintiff] complains were committed by her immediate supervisor, Lewis-Begin, rather than by Klein. [plaintiff] claims, despite offering no evidence in this regard, that Lewis-Begin was motivated by her friendship with Klein's wife to criticize [plaintiff]'s job performance. Such a motivation, however, would be attributable to personal animosity and would not meet the Title VII requirement that the alteration of terms and conditions of employment be 'because of ... sex.'"

<u>Id</u>. at 1200.

Like the harassment in <u>Succar</u> and <u>Pipkins</u>, Edmonson's alleged harassment of Davidson, the root of which was apparently an intimate relationship between Edmonson and another former co-worker, Dennis Brooks, does not constitute sex-based harassment under Title VII; nor does it even come close.  McConnell contends that her belief that Edmonson was sexually harassing Davidson was objectively reasonable because Edmonson "disliked women" and her behavior made Davidson feel "uncomfortable."[39]  However, even viewed in the light most favorable to McConnell, the evidence clearly indicates that Edmonson's behavior toward Davidson was based on personal animosity, if anything, and not sex.

McConnell herself believed that Edmonson was harassing Davidson not because Davidson was a woman, but because she personally disliked Davidson and was jealous because Davidson was friendly with Dennis Brooks, with whom Edmonson had once had an intimate relationship.  McConnell does not argue that Edmonson "disliked women across the board";

---

39. Plaintiff's response to summary judgment motion (Doc. No. 16), p. 26.

rather, she specifically stated in her deposition testimony that Edmonson only "disliked women that Dennis [Brooks] ... used to stop and talk to."[40]   Furthermore, there is no other evidence in the record that indicates that Edmonson targeted Davidson because of her sex.   Significantly, Davidson herself never described Edmonson's harassment in sex-based terms; rather, she told the doctor and McConnell that she "had a new department head who didn't like her," and later told McConnell, "I feel like I'm being lied on ... I feel like [Edmonson and Abney] are trying to get my job."[41] Although Edmonson reprimanded Davidson several times for wearing tight or suggestive clothing, there is no evidence in the record to indicate that these reprimands were sex-based either.

In addition, there is no evidence indicating that any of the alleged harassment personally observed by McConnell was based on Davidson's sex; McConnell recounts that, on several

40.  Id. at 207.

41.  Defendant's motion for summary judgment (Doc. No. 10), Ex. 1, p. 193-94.

occasions, she simply saw Edmonson "staring" at Davidson looking "mad" and "[as] if looks could kill" and making her "uncomfortable."[42]  All of this, as previously noted, appears to have been related to Edmonson's personal dislike for Davidson, rather than Davidson's gender.

Because McConnell's belief that Davidson was being sexually harassed by Edmonson was not objectively reasonable, she has failed to establish that she engaged in statutorily protected expression as required by Title VII. Thus, she cannot establish a prima-facie case of retaliation, and the court need not reach the issue of whether a causal connection exists between her complaints to management about Edmonson's treatment of Davidson and her subsequent termination; summary judgment on this claim is due to be granted.

### B. State-Law Claims

28 U.S.C.A. § 1367(c)(3) provides that a "district court

---

42.  Id. at 213-14.

may decline to exercise supplemental jurisdiction over a claim if ... the district court has dismissed all claims over which it has original jurisdiction."  Because summary judgment is due to be granted on McConnell's federal claim, the court declines to exercise supplemental jurisdiction over her state-law claims for negligent and wanton retention and failure to supervise and train.  Accordingly, these claims will be dismissed, albeit without prejudice.  <u>See United Mine Workers of America v. Gibbs</u>, 383 U.S. 715, 726-727, 86 S.Ct. 1130, 1139 (1966); <u>L.S.T., Inc. v. Crow</u>, 49 F.3d 679, 685 (11th Cir. 1995).  The court's dismissal of this state-law claims should not work to McConnell's disadvantage.[43]

---

43. Section 1367(d) provides for at least a 30-day tolling of any applicable statute of limitations so as to allow a plaintiff to refile its claim in state court.  The section states:

> "The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the
> (continued...)

### IV. CONCLUSION

For the foregoing reasons, the court concludes that WestPoint Stevens's summary-judgment motion is due to be granted on McConnell's Title VII retaliatory discharge claim and that McConnell's state-law claims are due to be dismissed without prejudice.

An appropriate judgment will be entered.

DONE, this the 6th day of September, 2005.


    /s/  Myron  H.  Thompson
    UNITED STATES DISTRICT JUDGE

---

43.  (...continued)
     claim is pending and for a period of 30
     days after it is dismissed unless State
     law provides for a longer tolling period."

27